790 A.2d 732

Wendell ANDERSON

v.

STATE of Maryland.

No. 2890, Sept. Term, 2000.

Court of Special Appeals of Maryland.

Feb. 4, 2002.

---

Thomas S. Hood, Towson, for appellant.

Kathryn Grill Graeff, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Sandra A. O'Connor, State's Atty. for Baltimore County, Towson, on the brief), for appellee.

Argued before JAMES R. EYLER, ADKINS, and KRAUSER, JJ.

KRAUSER, Judge.

Appellant, Wendell Anderson, a teacher at Kenwood High School, was accused of having sexual intercourse with a ninth grade Kenwood student. He was subsequently charged with child abuse and five related offenses. Following a bench trial in the Circuit Court for Baltimore County, he was convicted of child abuse and all but one of the related offenses.[1] He was thereafter sentenced to a term of three years' imprisonment for child abuse and a term of one year imprisonment for third degree sex offense.[2] After suspending all but one year of the child abuse sentence, the court ordered that the two sentences were to be served concurrently.

The principal issue presented by this appeal is whether consensual sexual intercourse between a teacher and a fourteen-year-old student that occurs after school hours and off school premises can constitute "child abuse" under Maryland law. Because we find that a parent impliedly consents to a teacher taking all reasonable measures to assure the safe return of his or her child from school, including personally driving that child home; because appellant assumed that responsibility when he agreed to drive the child home; because the events leading up to this unfortunate occurrence were set in motion on school property; and because, at the time of the offense, there had been no temporal break in the teacher and student relationship that existed between appellant and the victim, we shall affirm appellant's conviction for child abuse. For the reasons that follow, the resolution of that question largely renders appellant's remaining issues concerning his motion to sever and the admission of a taped

---

1. Appellant was acquitted of second degree assault.

2. The trial court held that count 3 (attempted third degree sex offense), count 4 (attempted fourth degree sex offense), and count 5 (attempted fourth degree sex offense) merged with count 2 (third degree sex offense).

conversation between appellant and the student moot. Consequently, we shall also affirm his conviction for third degree sex offense.

Because appellant is challenging the evidentiary basis of the circuit court's rulings at both the motions hearing and appellant's trial, we shall briefly review the evidence presented, first, at the motions hearing and then at trial.

## Motions Hearing

Before trial, appellant moved to suppress the recording of a telephone conversation between the victim ("Cindy") and appellant, which had been recorded by Detective Joseph Donohue, the officer investigating Cindy's accusations. That telephone conversation had been intercepted pursuant to the Maryland Wiretapping and Electronic Surveillance Act ("the Act"), Md.Code Ann. (1998 Repl.Vol., 2000 Cum.Supp.), §§ 10–401 through 10–414 of the Courts and Judicial Proceedings Article, which permits law enforcement officers investigating an allegation of child abuse to intercept telephone conversations to obtain evidence of that offense so long as one party to the conversations consents to the interception. *See* Cts. & Jud. Proc. § 10–402(c)(2).

At the motions hearing, Detective Donohue testified that when he was a member of the Family Crimes Unit of the Baltimore County Police Department, he was assigned to investigate a claim by a fourteen-year-old female student that appellant had had sexual intercourse with her. During that investigation, Detective Donohue interviewed the student, Cindy. Cindy told Detective Donohue that, while she was staying after school to assist her math teacher, appellant had offered her a ride home. She accepted that offer and got into his car. On the way home, appellant asked her if she would like to play pool at his house. She agreed. At appellant's house, he and Cindy played pool and then went into the living room. "One thing led to another," according to Cindy, and their kissing "eventually progressed into sexual intercourse."

Detective Donohue also interviewed Cindy's math teacher, Nina Riggs. During that interview, Ms. Riggs informed the detective that she had had a telephone conversation with Cindy in which Cindy stated that she had sex with appellant. Believing that he was investigating a case of child abuse and related sex offenses, Detective Donohue sought and obtained consent from Cindy and her mother, under the Maryland Wiretap and Electronic Surveillance Act, to record a telephone conversation between Cindy and appellant. During the recorded telephone conversation, appellant did not deny that he had sexual intercourse with Cindy, a fact which the circuit court found particularly significant, and reminded Cindy "you told me you have been saying all weekend you would protect me, this is a test to that promise." Appellant was subsequently charged with child abuse and a number of related sex offenses.

Holding that Detective Donohue had a good faith belief that he was investigating a case of child abuse, the court denied the motion to suppress. Appellant then moved to sever his trial on the child abuse charge from the other charges, claiming that the introduction of the recorded telephone conversation on the child abuse charge would prejudice his trial on the other counts of his indictment. That motion was also denied.

## Trial

At trial, the fourteen-year-old victim testified that she had come to know appellant through her math teacher, Nina Riggs. She explained that "once or twice a week," she would stay after school to help Ms. Riggs "tutor other students" or to receive tutoring herself. Appellant, she stated, "would come into the room where [she] was staying after school to help out." Cindy was not a student of appellant's, nor was she in any clubs or teams that appellant coached, but she "occasionally asked him for . . . help with a math situation if [she] couldn't get a hold of Ms. Riggs." In addition, appellant had driven her home from school on two or three occasions.

On June 9, 2000, the last day of the school year, the school day ended at noon. That day, Cindy "stayed after with Ms.

Riggs to help her with her room." While she was walking in the hallway with Ms. Riggs and her daughter, whom Ms. Riggs had brought to school that day, appellant approached and invited them to go to lunch with him. They then left school property with appellant, in his car, and had lunch at a nearby McDonald's restaurant. About a half hour later, all four of them returned to school in appellant's car and Cindy resumed "help[ing] Ms. Riggs with her room and her daughter." When appellant asked Cindy if she wanted a ride home, she accepted his offer.[3] Sometime after 2 p.m., appellant and Cindy left the school in appellant's car. While driving Cindy home, appellant asked her if she wanted to play a game of pool at his house; she replied that she did. Appellant then drove Cindy to his house.

At appellant's home, the two played pool and then went into appellant's living room. After rubbing Cindy's face, appellant began to kiss her. He kissed her awhile and then led her to his bedroom where they had sexual intercourse.

After Cindy testified, the State played the recorded telephone conversation between Cindy and appellant. As noted earlier, during that recorded conversation appellant did not deny that he had had sexual intercourse, and reminded Cindy "you told me you ... would protect me, this is a test to that promise."

Appellant, however, maintained his innocence throughout the trial, testifying that he took Cindy to his home not to play pool, but out of concern for her safety. He stated that when they were about two blocks from her home, she said "I can't go home." When appellant asked "why not" she replied, "I can't tell you. I just can't go home right now." She continued, "I just need someone I can talk to right now."

They drove around for "fifteen, thirty minutes." Appellant explained, "I was trying to find out from her why she didn't

---

**3.** On this point, Cindy's testimony is confusing and contradictory. Later, on cross-examination, she testified that she had asked appellant for a ride home.

feel she could go home. I was concerned that the abuse that was at home with her mother and the problems there were still a problem." He insisted, "I didn't want to deliver her to an unsafe situation."

While "circling her neighborhood," appellant stated that he realized that "[i]t was very hot outside." He told Cindy that he needed "to go home and check on [his] dog." Appellant drove to his house, "let [Cindy] into the house," and "went to the backyard to check on the dog." After checking on his dog, appellant joined Cindy inside.

Inside the house, Cindy said "she couldn't go home yet." When appellant asked her when she could, she responded, "sometime between 5:00 and 6:00." Realizing that they "had about an hour to kill," they decided to play pool.

After playing pool, the two went to appellant's living room. Sitting on the living room sofa together, Cindy told appellant how much she appreciated his spending time with her, listening to her, and taking care of her. She then leaned over, according to appellant, and kissed him.

After that kiss, appellant claimed, he drove her home. He further testified that he did not have sexual intercourse with Cindy on that day, or on any other.

Appellant's counsel then replayed the recorded conversation between appellant and Cindy, stopping periodically to request an explanation from appellant as to the meaning or context of the preceding recorded comments. As the court apparently rejected his explanations in rendering its verdict, we need not recount them now. Cindy's mother testified that she entrusted Kenwood High School with her daughter on school days. She further testified that when her daughter "stayed after school to help a teacher, her daughter would call her [and] either she or her sister's boyfriend would pick her up." She also stated that she was unaware that appellant had previously driven her daughter home from school, and, on crossexamination, agreed that she had not asked appellant to be responsible for the supervision of her daughter on that day.

Cindy's math teacher, Ms. Riggs, testified that Cindy would come to her classroom after school "on a regular basis . . . for either tutoring or to talk" or just to "socialize." She further stated that on June 9, 2000, the last day of the school year, Cindy stayed after school "to help me get my room closed up, to help me clean up my room and get things put away for the summer."

The principal of Cindy's high school, Ellen Goldian, testified about the responsibilities of the teachers at Kenwood High School. Specifically, she stated that teachers "are given a set of five classes to teach and they are expected to do hall duty, supervision hall duty between changes of classes. They generally get one hour a day and they are given chaperon duties after school." She also stated that the "teachers are responsible to assure the safety of the students," regardless of whether they are on hall duty or whether a student is a member of their class.

## Discussion

### I.

Appellant contends that the evidence adduced at trial was not sufficient to support his conviction for child abuse under Article 27, § 35C of the Maryland Code Annotated.[4] That statute prohibits child abuse, sexual or physical, by "[a] parent or other person who has permanent or temporary care or custody or responsibility for the supervision of a child or a household or family member. . . ." *See* Md.Code Ann. (1957, 1996 Repl Vol., 2000 Cum.Supp.), Art. 27, § 35C(b)(1). In other words, to be subject to § 35C, one must be either (1) the parent of a child, (2) a household or family member of a child, (3) a person who has permanent or temporary care or custody of a child, or (4) a person who has responsibility for the supervision of a child. It is the last class of individuals— persons with responsibility for the supervision of a child—

---

4. Appellant's claim of insufficiency of evidence applies only to his conviction for child abuse. He does not claim that his other convictions were not supported by sufficient evidence.

which provided the basis for appellant's conviction for child abuse. Consequently, appellant contends that the evidence did not establish that he was a person with "responsibility for the supervision" of Cindy at the time he and Cindy had sexual relations. He therefore claims that his conviction for child abuse cannot stand. We disagree.

■ To understand what "responsibility for the supervision of a child" is, we begin by stating what it is not. It is not the assumption of the "permanent or temporary care or custody" of a child. That, as the Court of Appeals indicated in *Bowers v. State,* 283 Md. 115, 389 A.2d 341 (1978), equates to *"in loco parentis"* status. And that status "'arises only when one is willing to assume all the obligations and to receive all the benefits associated with one standing as a natural parent to a child.'" *See Pope v. State,* 284 Md. 309, 323, 396 A.2d 1054 (1979) (quoting *Fuller v. Fuller,* 247 A.2d 767 (D.C.1968), *appeal denied,* 418 F.2d 1189 (1969)). Nor did the legislature intend, as the Court of Appeals pointed out in *Pope,* that these two phrases be synonymous, as the legislature added by amendment the category of those "responsible for the supervision of a child" several years later. *See id.* at 322, 396 A.2d 1054. In other words, as the Court explained:

A person may have the responsibility for the supervision of a minor child in the contemplation of § 35A although not standing in loco parentis to that child. "Responsibility" in its common and generally accepted meaning denotes "accountability," and "supervision" emphasizes broad authority to oversee with the powers of direction and decision.

*Id.* at 323, 396 A.2d 1054.

This responsibility, the Court added,

may be obtained only upon the mutual consent, expressed or implied, by the one legally charged with the care of the child and by the one assuming the responsibility. In other words, a parent may not impose responsibility for the supervision of his or her minor child on a third person unless that person accepts the responsibility, and a third

person may not assume such responsibility unless the parent grants it.

*Id.* at 323–24, 396 A.2d 1054.

The Court cautioned, however, that a "third person in whom responsibility has been placed is not free to relinquish that responsibility without the knowledge of the parent. For example, a sitter may not simply walk away in the absence of the parents and leave the children to their own devices." *See id.* at 324, 396 A.2d 1054.

■ In the instant case, there is no dispute that every teacher of Kenwood High School had responsibility for supervising all of the students during and after school hours, and that they had the implied consent of the parents to do so. Appellant concedes as much in his brief. There, he states that he had "a responsibility for supervision of [Cindy]," and that he had responsibility for the supervision of all students "by mutual consent, while they are at the school or while involved in a school related activity off the school premises." The "mutual consent," appellant agrees, is "implied."

This point was buttressed by the testimony of both Cindy's mother and the school's principal. At trial, Cindy's mother stated that she believed that she had entrusted her daughter to the high school during school days. And the principal of Kenwood High School testified that the teachers "are responsible to assure the safety of the students," regardless of whether they are on hall duty or whether a student is a member of a teacher's class. In short, mutual implied consent to supervise Cindy at school existed by virtue of appellant's status as a teacher at Cindy's high school.

Appellant, however, contends that the "mutual implied consent which existed due to the Appellant's position as a teacher ended when he and the child left the school." In support of that proposition, he asserts that "there was no request by her mother that the Appellant drive the child home or that he be responsible for her during the ride home." Nor was there, he points out, a "pattern of conduct where the appellant had regularly driven the child home with the knowledge and

consent of her parent." He therefore concludes that, as there was no mutual consent that he drive Cindy home, he could not have had responsibility for supervising her during that trip.

Cindy's mother may not have known that appellant had assumed the task of driving her home from school, but, from that fact, it does not follow that she did not impliedly consent to his doing so. Indeed, it is absurd to suggest that when a parent entrusts her child to a school that that parent does not impliedly consent to any reasonable assistance that a teacher may provide to assure the child's return home from school. In other words, it may be reasonably assumed by both parent and teacher that a parent impliedly consents to all reasonable measures taken by a teacher to assure the safe return of the child from school, including personally driving that child home. Indeed, it is hard to imagine that appellant would have taken on the task in the first place, thereby possibly exposing himself to potential civil or criminal liability, if he did not believe that he had the implied consent of Cindy's mother to do so.

Once a teacher assumes the task of personally transporting a child from school to home with the implied consent of the child's parent, he or she also assumes the responsibility of supervising that child. Indeed, were we to rule otherwise, there would be nothing to prevent such a teacher from changing his or her mind midway and dropping the child off at any location along the way, without the knowledge or consent of the child's parent. As the Court of Appeals observed in *Pope*, once assumed, a "third person ... is not free to relinquish that responsibility without the knowledge of the parent .... and leave the children to their own devices." *See Pope*, 284 Md. at 324, 396 A.2d 1054.

Finally, there was no temporal break in the teacher and student relationship that existed between appellant and the child. Such a break, depending on its length and nature, can interrupt the implied consent of the parent and dispel the teacher's duty to supervise. Had appellant and Cindy met, for example, after they had parted, at a location unconnected with

Kenwood High School, we might have reached a different result in this case. But that is not the case here. Indeed, appellant's offer to give the child a ride home was made on school premises while the child was still under the supervision of appellant. And the trip home began on school premises, where appellant and Cindy got into his car. From the moment he extended his invitation until the time he and Cindy had sexual intercourse, she was never for long, if ever, either out of his sight or, for that matter, out from under his influence or control. At bottom, a teacher-student relationship is based on the student's trust and acquiescence to her teacher's authority. At no time was there a temporal break in that relationship so that we might conclude the relationship inducing both trust and acquiescence to authority had at least temporarily ended.

The standard for determining whether there is sufficient evidence to support a conviction "is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *see also Burch v. State,* 346 Md. 253, 272, 696 A.2d 443 (1997). As is evident from our discussion of the evidence, there existed in the instant case more than sufficient evidence from which any rational trier of fact could find that appellant had "responsibility for the supervision" of Cindy at the time he and the fourteen-year-old student had sexual relations, and that he was guilty of child abuse.

Understandably, appellant disagrees. Relying on an attorney general's opinion and two cases, *Pope v. State, supra,* and *Newman v. State,* 65 Md.App. 85, 499 A.2d 492 (1985), appellant claims that the circumstances surrounding his encounter with Cindy preclude, as a matter of law, a finding that he was a person with "responsibility for supervision" of Cindy at the time the sexual contact in question occurred. That reliance, however, is misplaced.

Appellant argues that 82 Att'y Gen. Op. 17 (1993) supports his claim that at the time of the alleged child abuse he had no responsibility to supervise Cindy. The issue addressed by that opinion was "whether a teacher who has sexual contact with a student after school hours and off the school premises may be considered a person with 'permanent or temporary custody or responsibility for supervision' of the student and thus may be charged with child abuse under Article 27, § 35C of the Maryland Code." *See* 82 *Opinions of the Attorney General* 017, 107 (1997). The opinion states:

Our opinion is as follows: Article 27, § 35C applies, even after school hours or off the school premises, to a teacher who has "custody or responsibility for supervision of the child." A teacher may be considered responsible for the supervision of the student, and therefore subject to Article 27, § 35C, if the teacher is with the student in connection with an activity related to the school's academic extra-curricular program or otherwise as a result of permission from the child's parents for the child to accompany the teacher. *Article 27, § 35C does not apply, however, if the teacher is with the student under circumstances unrelated to school programs or parental permission.* In other words, as § 35C is currently drafted and applied by the courts, the fact that a teacher is with a student is alone insufficient to satisfy the "custody or ... supervision" component of the child abuse law.

*Id.* (emphasis added). Citing this language, appellant denies that, at the time of the alleged child abuse, he had any responsibility for the supervision of Cindy. Appellant's brief states, "The facts in this case are clear that [Cindy] was not at the Appellant's house due to any school related activity or as a result of permission from her mother. Accordingly, under the Attorney General's analysis, Article 27, Section 35C does not apply."

■ We of course are not bound by an Attorney General's opinion. *See Dodds v. Shamer,* 339 Md. 540, 556–57, 663 A.2d 1318 (1995). Moreover, the opinion in question is based on a case that is clearly distinguishable from the instant case,

although it involves, as the instant case does, sexual relations between teacher and a student after school hours and off of school property. That is, as we shall explain, where the similarity between the two cases ends. Consequently, we hold that the Attorney General's opinion is not applicable to the facts of the instant case.

In the case before the Attorney General, child sex abuse charges were brought "against a middle school teacher who had weekly sexual contact with a fourteen-year-old student of his after school hours at a park or shopping center near the school." The trial court held "that the State had failed to prove a key element of the charge—that the teacher had 'permanent or temporary custody or responsibility for supervision of the child.'" And the Attorney General agreed.

In that case, however, there was no basis for the Attorney General to find implied parental consent to those clandestine meetings. Nor could a teacher have reasonably believed that he or she had parental consent to meet secretly at a park or shopping center with a student.

In contradistinction to that case, the circuit court here justifiably found implied consent. Although the court failed to articulate its precise reasons for doing so, it was reasonable for the court to conclude that school parents impliedly consent to teachers taking reasonable steps to assure that those children, who stay after school to work with their teachers, will have a means of getting home, including being transported by their teachers if the teachers are willing to assume that responsibility.

Moreover, there was no temporal break in that relationship, as might have occurred in the case before the Attorney General. We can only speculate here, because that opinion does not indicate how the teacher and his student in that case were able to meet at the shopping center and park where the sexual contact occurred. We do know that it was not considered by the Attorney General, as no mention was made of it in the opinion. In any event, the facts of the instant case are different in substantial and significant ways from those of the

case that were before the Attorney General. We therefore conclude that appellant's reliance on 82 Att'y Gen. Op. 17 is misplaced.

Appellant next turns to *Pope* in support of his claim that his responsibility for supervising Cindy evaporated at the conclusion of the school day on which the abuse occurred. In *Pope,* a three-month-old baby died from physical injuries inflicted by his mother, who poked, squeezed, shook, and beat him while in the grip of a " 'religious frenzy.' " *See Pope,* 284 Md. at 315, 396 A.2d 1054. At that time, she believed herself to be " 'God' " and that " 'Satan had hidden in the body of her son.' " *See id.* The abuse occurred in Pope's presence and at her home, where the mother and infant were temporarily staying. Pope testified that she was too " 'fearful' " and " 'shocked' " to prevent the beating. *See id.* at 316, 396 A.2d 1054. She was nonetheless convicted of child abuse. That conviction, however, was reversed by the Court of Appeals, which held that because Pope had neither "permanent or temporary care or custody" of the child, nor responsibility for his supervision, she could not be convicted of child abuse. *See id.* at 328–30, 396 A.2d 1054.

Having earlier quoted at length from the *Pope* opinion, we need not now restate the reasoning underlying that decision. Nor is it necessary to even advert to it, because appellant's interest in *Pope* is confined principally to the following statement in that opinion: "So it is that a baby sitter temporarily has responsibility for the supervision of a child.... And it is by mutual consent that a school teacher has responsibility for the supervision of children in connection with his academic duties." *Id.* at 324, 396 A.2d 1054.

Quoting that language, appellant argues that once the school day ends and a student is with a teacher for a reason unrelated to an academic activity, that teacher no longer has any responsibility for the supervision of that child. That language, however, was clearly intended to be illustrative of a point the Court was making and not dispositive of any issue before it. Consequently, it is of no precedential value.

Indeed, the issue of when a teacher's responsibility for the supervision of school children begins and ends was not even before the Court in *Pope*. Its reference to a teacher's "responsibility for the supervision of children in connection with his academic duties" was just one example given by the Court of when a school teacher was responsible for the supervision of students. There is no indication that the Court intended that to be the only set of circumstances under which such responsibility arises, a conclusion also reached by the court below. In finding appellant guilty of child abuse, the circuit court expressed its belief that the Court of Appeals did not intend to define "child abuse" so narrowly that it would not encompass abuse that occurred in the context of the "other responsibilities that teachers have that are not strictly academic." We agree and, therefore, find appellant's reliance on *Pope* unpersuasive.

The final authority, cited by appellant, in support of his rather narrow interpretation of a teacher's supervisory responsibility for students is *Newman v. State, supra.* In that case, the defendant was convicted of raping and sexually abusing a thirteen-year-old girl, who babysat his girlfriend's children at his home. Noting that the "victim's mother ... testified that [the defendant] 'was to take care of [the victim] and insure her safety to and from the [the defendant's] house,'" this Court held that the "there was legally sufficient evidence" to support a finding of child abuse. *See Newman,* 65 Md.App. at 99, 499 A.2d 492. In contrast, appellant points out that Cindy's mother

testified that she was not aware that the Appellant would be driving her daughter home on June 9, 2000; that she did not ask the Appellant to be responsible for the supervision of her daughter on June 9, 2000 and that there was no agreement between her and the Appellant that the Appellant would be responsible to supervise her daughter on that day.

The consent given by the victim's mother in *Newman* appears to have been more overt and specific than the implied consent granted by Cindy's mother. Without such specific

consent, this Court would not have been able to hold that the defendant, who had no special relationship with the victim—familial, pedagogical or otherwise—had assumed responsibility for her supervision. In the instant case, however, there was a special relationship between the victim and her abuser: the relationship of trust and responsibility that exists between student and teacher. It is that relationship which induces parents to consent, expressly and impliedly, to all reasonable actions taken by teachers to assure the safe return of their children, including providing, if necessary, the means by which this objective will be achieved. In sum, the case *sub judice* presents sufficient evidence to support a finding of implied consent and, therefore, child abuse.

## II.

Appellant next contends that the circuit court erred in denying his motion to suppress the recorded telephone conversation between him and the victim.

 In reviewing the denial of a motion to suppress, we may consider only the facts produced " 'at the suppression hearing ... which are most favorable to the State as the prevailing party on the motion.' " *See Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239 (1990) (citations omitted). If there is conflicting evidence, we must adopt the findings of fact of the trial judge, unless the findings are clearly erroneous. *See id.* We are, however, required to "make our own independent constitutional appraisal" as to whether an action was proper "by reviewing the law and applying it to the facts of the case." *See Matthews v. State,* 106 Md.App. 725, 732, 666 A.2d 912 (1995). Applying that standard to the instant case, we hold that the circuit court did not err in denying appellant's motion to suppress.

The telephone conversation in question was intercepted by police, pursuant to the Maryland Wiretapping and Electronic Surveillance Act ("the Act"), Md.Code Ann. (1998 Repl.Vol., 2000 Cum.Supp.), §§ 10–401 through 10–414 of the Courts and Judicial Proceedings Article. Section 10–402(c)(2) of that Act

permits law enforcement officers "acting in a criminal investigation ... to intercept a wire, oral, or electronic communication in order to provide evidence of the commission" of certain enumerated crimes, including child abuse, when "one of the parties to the communication has given prior consent to the interception."

At the motions hearing, appellant argued, as he does before this Court, that Detective Donohue, in recording appellant's conversation with Cindy, knew or should have known that appellant's conduct did not constitute child abuse, and therefore appellant did not fall within the class of persons to which the child abuse statute applies. Because the detective could not have believed that he was investigating child abuse, according to appellant, his interception of appellant's conversation was not in accordance with § 10–402(c)(2), and therefore, the recording of that conversation should have been suppressed.

Rejecting that argument, the motions court found Detective Donohue's testimony, that he believed he was investigating child abuse at the time that he recorded the conversation at issue, to be credible. This belief, opined the judge, warranted the detective's interception of appellant's telephone conversation with the victim. The court's precise words were:

I think the important point with regard to the suppression of the tape is that the detective himself, what he thought.

He felt that he was investigating a possible child abuse and it was done in good faith. There is certainly no indication whatsoever that Detective Donohue felt that he was merely investigating a possible sex crime. And as such I think he was within the purview of the statute and would be allowed, upon getting the proper waivers from the victim and her mother, to listen in and tape the telephone conversation. The jury may well decide it does not constitute child abuse. But I think by this definition I think he had a right to take the tape.

So the motion to suppress the tape of Defendant and the victim in this case is going to be denied.

 As this Court has stated, § 10–402(c)(2) "does not ... require the target of the investigation to have actually been adjudged guilty of committing one of [its enumerated] crimes. Suspicion enough to warrant an investigation is sufficient." *Fearnow v. Chesapeake & Potomac Telephone,* 104 Md.App. 1, 24 n. 21, 655 A.2d 1 (1995), *rev'd on other grounds,* 342 Md. 363, 676 A.2d 65 (1996). Because there is no basis for holding that the circuit court's finding of good faith was plainly erroneous and because the victim's statement to the detective, prior to the interception of the conversation, provided compelling evidence of child abuse, appellant's argument is unpersuasive.

Moreover, because we conclude that appellant's conduct did constitute child abuse, his argument, which was based entirely on the claim that it was obvious that his conduct did not amount to child abuse, is now moot.

## III.

Appellant's last contention is that the trial court erred in denying his motion to sever the count charging him with child abuse from those counts charging him with other offenses. Specifically, appellant argues that "[i]f the child abuse count was tried separately, and the Appellant was found, as a matter of law, not to be in the class of persons to whom Article 27, Section 35C is directed, the tape would not be admissible in a later trial as to [the] sexual offense[s]. . . . " Because there was no severance, appellant further argues, "[o]nce the [trial judge] heard the taped conversations, it ... necessarily affect[ed] his decision on all the charges against the Appellant. Severing the trial of the child abuse count [would have] avoid[ed] the prejudice caused by the tape."

Once again, appellant's argument rests entirely on the assumption that appellant's conduct did not constitute child abuse. Because we hold that appellant's conduct did constitute child abuse, his argument that he was wrongfully denied severance, like his claim that the recorded conversation he had had with Cindy should have been suppressed, is now moot.

In any event, the recorded conversation was relevant to the question of whether appellant had engaged in sexual intercourse with the victim. It was therefore central to the proof of all charges and would have been admissible at a later trial of the remaining counts had severance been granted. Consequently, appellant suffered no prejudice from the court's denial of his motion to server.

Indeed, even if the recorded conversation was not central to the proof of all charges, its admission into evidence would not have been error. At a bench trial, as we had here, "the judge has significantly more discretion on the severance/joinder issue than is permitted in a jury trial." *Wieland v. State*, 101 Md.App. 1, 13, 643 A.2d 446 (1994) (citing *Graves v. State*, 298 Md. 542, 471 A.2d 701 (1984)). He or she "has the discretion to permit joinder of offenses . . . even if there is no mutual admissibility of offenses because it may be presumed that a judge will not transfer evidence of guilt as to one offense to another offense." *Conyers v. State*, 345 Md. 525, 552–53, 693 A.2d 781 (1997).

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**